N Jane DuBovy, CSB#98817
Mandy S. L. Favaloro, CSB#239482
Maeve Crommie, CSB#315694
A2Z Educational Advocates
881 Alma Real Drive, Suite 309
Pacific Palisades, CA 90272
(310) 573-1430 Office
(310) 573 1425 Fax
njanedubovy@a2zedad.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT

E.S., a minor, by and through her Parents, Justin Silvera and Stephanie Silvera, and on their own behalves,

Plaintiffs,

v.

Beverly Hills Unified School District,

Defendant

Case No.: 2:22-CV-924

COMPLAINT AND PRAYER FOR RELIEF UNDER
1. The Individuals with Disabilities Education Improvement Act (20 U.S.C. §1400 et seq.); and

2. Section 504 of the Rehabilitation Act (29 U.S.C. §794 et seq.).

Plaintiffs, E.S., a minor, by and through her Parents, Justin Silvera and Stephanie Silvera, and on their own behalf, ("Plaintiffs") hereby submit their Complaint against Defendant, Beverly Hills Unified School District ("District" or "Defendant".) Through its Complaint, Plaintiffs request judicial review of the

administrative decision issued by the California Office of Administrative Hearings ("OAH") on November 12, 2021 as revised on November 22, 2021, in the matter designated as OAH Case Nos.2021040512.  In support of their Complaint, Plaintiffs allege as follows.

## INTRODUCTION

1.    Plaintiffs request review of the OAH Decision rendered in the administrative hearing in the underlying matter.  This Complaint arises out of the IDEA and is brought pursuant to 20 U.S.C. §1425 and is timely as an appeal based on the authority of *Orange County Health Care Agency v. Dodge, et. al*, 793 F.Supp.2d 1121 (C.D. CA 2011).  This action is commenced to seek an order (1) reversing the decision of the California Office of Administrative Hearings, ("OAH") dated August 25, 2021, and (2) awarding appropriate relief under the Individuals with Disabilities Education Improvement Act (20 U.S.C. §§1415 et seq.) ("IDEIA").

## JURISDICTION AND VENUE

2.    This action arises under the Individuals with Disabilities Act ("IDEA"). Plaintiffs also raise related claims under Section 504 of the Rehabilitation Act ("Section 504").  This Court has jurisdiction of the matter under 20 U.S.C. §1415 and 28 U.S.C. §1331.  Pursuant to 20 U.S.C. §1415(i)(3)(A), the District Court's jurisdiction in this matter is without regard to the amount in controversy.

3.    Parents have exhausted all required administrative remedies in this matter by

pursuing a due process case under the California Office of Administrative Hearings on all claims related to the provision of a free and appropriate public education ("FAPE") alleged herein.

4.     Venue is proper is the United States District Court, Central District of California, as authorized by 28 U.S.C. §§1391 & 1392.

## STANDARD OF REVIEW

5.     In evaluating a case filed under the IDEA, the District Court "shall receive the records of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. §1415(e)(2).  The District Court proceeding "under the IDEA is a hybrid, akin to a trial de novo." *Union School District v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994).

6.     Although, the District Court is required to give "due weight" to the decision of the ALJ, and the "court must ultimately reach an independent decision based on a preponderance of the evidence." *Board of Education v. Rowley*, 458 U.S. 176, 205 (1982). "Congress intended 'judicial review in IDEIA cases to differ … substantially from judicial review of other agency actions in which courts are generally confined to the administrative record and are held to a highly deferential standard of review.'" *Amanda J. v. Clark County School District*, 260 F.3d 1106 (9th Cir. 2001) (*quoting Ojai Unified School District v. Jackson*, 4 F.3d 1467, 1471

(9th Cir. 1993).

7.     The reviewing court must determine whether the school district met the legal requirements of the IDEA, based on the very specific facts of the particular case at hand.  *See San Rafael ES District v. California Special Education Hearing Office*, 482 F.Supp.2d 1152, 219 Ed. Law Rep. 676 (N.D. Cal. 2007)**.**

## **PARTIES**

8.     Plaintiffs in this proceeding are ES., a minor child whose resident address is with Parents, Justin Silvera and Stephanie Silvera; the individual Parents on their own behalf and on behalf of E.S. (hereinafter sometimes referred to as "Parents"). At all times relating to this matter Parents have resided in Beverly Hills, California, within the boundaries of Defendant, Beverly Hills Unified School District, "District").  Parents are responsible for the care, custody, and control of E.S. a minor child with a disability.

9.     Defendant Beverly Hills Unified School District is a public-school district duly organized and existing pursuant to the laws of the State of California, located in Los Angeles County, California, and is a Local Education Agency ("LEA") within the meaning of the IDEA.  The District is a recipient of federal financial assistance for purposes of the IDEA.  At all times relevant, District was and is the LEA responsible for providing to E.S. a Free and Appropriate Public Education ("FAPE") within the meaning of the IDEA.  The District is governed by the laws

of the State of California, the laws of the United States, and the Constitution of the United States in carrying out its duties and responsibilities.

## **STATEMENT OF FACTS**

1.  E.S. was born on December 24, 2006.  E.S. has a complex diagnostic profile, which includes but is not limited to diagnoses of Generalized Anxiety Disorder ("Anxiety"), Major Depressive Disorder ("Depression"), Attention Deficit Hyperactivity Disorder ("ADHD"), and specific learning disorder in math, written expression and reading; along with a history of significant mental health concerns that have included significant emotional and behavioral dysregulation, pervasive negative thoughts, and threats of self-harm and suicidal threats and actions.

2.  E.S. is eligible for special education and related services under the primary eligibility category of Other Health Impairment ("OHI").

3.  E.S. has been enrolled in schools within the District since her kindergarten year, which was the 2012-2013 school year.  E.S. attended Hawthorne School in District for her elementary school years.  Although not identified as a student with a disability in her early elementary school career, E.S.'s report cards and statewide testing results indicate she was unable to meet grade level expectations in some math skills and struggled with social skills and classroom work habits.

4.  By the time that E.S. entered 6th grade, which was still on the Hawthorne School campus, the gap in her math skills was widening and she was experiencing

self-esteem difficulties related to school.  During her 6th grade year, E.S.'s needs in the school setting increased.  Teachers noted on report cards that she had disruptive behaviors in multiple classes, that she had a poor attitude and lacked self-discipline, and that her participation in class was inconsistent.

5.  E.S. was not referred by District for special education assessments during her 6th grade year.  The evidence presented in the underlying hearing established that District did not respond to her behaviors and academic struggles by initiating the special education process, opting instead to put informal supports in place through a behavior plan that was implemented by E.S. carrying a "behavior binder" throughout her school day to chart her progress.

6.  Parents were not aware of the availability of special education services at that time.  However, they were concerned about E.S.'s behaviors and her difficulty completing homework, so they sought out private services.

7.  E.S. transitioned to Beverly Vista Middle School for 7th grade during the 2019-2020 school year.  She struggled with schoolwork, behavior, and math early in the school year.

8.  A Student Success Team ("SST") meeting was held in the fall of 2019.  Parents were not provided with documentation of this meeting, including when they later requested educational records in 2021.  The SST documentation related to the interventions provided to E.S. was provided for the first time during the underlying

due process hearing in this matter.

9. During the fall and around the time of the SST meeting, Parents were in constant contact with the school team and were repeatedly requesting help for E.S. They asked if it was possible for E.S. to be assessed.

10. When finally provided, the fall 2019 SST paperwork documented an explicit request by Parents for an assessment to determine special education eligibility. The evidence presented in the underlying due process hearing established that District staff mislead Parents about the assessment process in response to that request and did not initiate an assessment plan or provide a written response.

11. E.S. was receiving private tutoring at this time, and District staff was well aware that this support was being funded by Parents. In fact, District staff relied on the fact that E.S.'s needs were being addressed with the support of outside interventions. E.S. was also referred for disciplinary actions during the fall of 2019. As with the SST documentation, the complete disciplinary records were not provided to Parents either at the time of the disciplinary actions or later when a records request was made in 2021.

12. The evidence at hearing established that the District destroyed some of the educational records related to E.S. when its online system changed, and it had never provided notice to Parents of this destruction.

13. When Parents' requests for assessments by the District during the SST meeting

fell on deaf ears, they sought out a private assessment report to ascertain how to help E.S. be successful at school.

14. In November 2019, Dr. Jayme Neiman-Kimel and Dr. Sloane Miller conducted a Neuropsychological Assessment of E.S.  The assessment report documented that E.S. had already at that time threatened self-harm, and that she had struggled greatly with behavioral and emotional regulation for some time.  It was reported that E.S. had engaged in outbursts in the classroom, walked out of the classroom without permission, and struggled with peer relations.  She was receiving individual psychotherapy for emotional dysregulation, worries/fears, and difficulties with social skills.

15. The assessors also documented E.S.'s needs related to academics, particularly in the area of math.  She was reportedly below grade level in math at that time and demonstrated avoidance behaviors in the class.

16. Standardized testing in overall cognitive ability revealed low average to average range abilities across domains, with some deficits noted in sustained attention and processing speed.  Testing in academics revealed scattered skills, with some relative weaknesses noted in sentence completion, spelling, and basic reading skills, and significant weaknesses noted across all math skills.

17. Within the diagnostic findings, the assessors noted ADHD and learning disorder in math.

18.  The assessors recommended an array of supports and interventions to help E.S.  These recommendations included: continuation of individual therapy/counseling; participation in a social skills group, educational therapy, and tutoring/individual support in math.

19.  Parents provided a copy of this assessment report to the District when it was completed.

20.  Parents had initially requested assessment of E.S. in October 2019 after District had failed to initiate assessment itself when it was clear she was struggling. Parents had reiterated that request in December 2021 when E.S.'s grades had declined further, believing that this was the trigger for special education based on the fact that District staff had informed them that E.S. should be failing "multiple classes" in order to warrant evaluation.  By that time, E.S. had been struggling at school for more than a year and had fallen further and further behind.

21.  In February 2020, District finally completed an assessment of E.S. to determine her eligibility for special education.  Although this assessment made a finding that E.S. was eligible under the IDEA, the overall findings and analysis were lacking regarding E.S.'s emotional regulation and behavioral needs.  The District assessor concluded that E.S. met criteria for eligibility under two categories:  Autism and OHI.

22.  Despite indicators for the need for an assessment of E.S.'s mental health

needs, such as her history of individual psychotherapy, reports of threats of self-harm, and history of behavioral dysregulation in school, this was not completed as part of District's initial assessment.

23.  On February 27, 2020, District convened E.S.'s initial IEP and found her to be eligible for special education under the category of OHI, with a secondary category of Autism.

24.  Parent testified in the underlying matter that the District's "offer of FAPE" and all operative components of the IEP were stated to her as if already decided. She was not aware at that time that alternative options should be considered or discussed, or that she could ask for additional supports such as counseling through the IEP.  Parent's testimony regarding District staff's predetermination of the IEP offer was corroborated by testimony of District staff establishing that the placement was already decided simply because this was "a math IEP."  It was also corroborated by District's own arguments throughout this case that by the time of the February 2020 IEP, the team merely "formalized" what it had already decided to implement in terms of math supports.

25.  Ultimately the IEP offered "specific academic instruction" ("SAI") for 480 minutes per week in a co-taught math class, which E.S. already attended prior to the IEP.  In the fall, it was anticipated that she would also attend SAI in a "math intervention class."

26.  In March 2020, District initiated school closures due to COVID-19, and schools were placed on distance learning.

27.  E.S. struggled significantly with the distance learning format and with participating in online classroom instruction.  She could not keep up with assignments and her mental health was deteriorating.  It was reported by teachers that she was "often absent" and struggled with her behavior during distance learning.  Parents were increasingly concerned about E.S.'s functioning.

28.  In the fall of the 2020-2021 school year, District continued to operate via distance learning, and E.S. continued to struggle.

29.  Parents were doing everything they could to support E.S. at this time.  They funded private tutoring to support E.S.'s academic learning and completion of assignments.  They funded counseling on a regular basis to try to address E.S.'s increasing mental health needs.  They frequently spoke with E.S.'s team at school, particularly the school counselor regarding their concerns about E.S.'s behavior and academic needs.  Throughout this time, they were never made aware that any additional interventions or supports, such as counseling sessions and other alternatives for SAI, could be made available through the IEP.

30.  On November 3, 2020, District staff communicated with Parents regarding E.S.'s ongoing struggles, documenting that they were relying on her private tutor and counselor to help support her success at school.  Concerns were noted about

E.S.'s work habits and lack of assignment completion in this correspondence. District did not propose an additional assessment.

31.   The District finally held an IEP for E.S. on February 27, 2020, where she was found eligible under the categories of OHI and ASD. The offered goals and support for E.S. were minimal.

32.   District amended E.S.'s IEP in August 2020 to remove part of the SAI minutes due to concerns that E.S. could not benefit from placement in a classroom with a particular teacher with whom she had experienced an incident in the year prior. The particular incident involved E.S. reporting that the teacher placed her alone in a closet when the teacher became frustrated with her in class.

33.   District again amended the IEP in November 2020 but did not add any mental health counseling services or refer E.S. for further assessment in that area at that time despite ongoing conversations with Parents regarding increasing concerns and awareness that E.S. was requiring outside interventions.  The only change at this IEP was to again offer SAI through an extra intervention or study skills class, which District staff and Parent had agreed earlier in the year would not be appropriate for E.S.

34.   In November 2020, E.S.'s anxiety and emotional dysregulation significantly escalated.  By this time, she was struggling immensely with completing schoolwork and was increasingly anxious.  Parent testified that E.S. engaged in a

suicidal threat that included action, resulting in a hospitalization on November 16, 2020.

35. Parents immediately communicated with District staff, specifically the school counselor, that E.S. had been hospitalized.  They then communicated to the counselor that the hospital was recommending a longer-term treatment program because E.S. could not be safely discharged otherwise.  In response, the counselor sent an email to Parents with recommendations for inpatient and outpatient programs.  On the face of this documentation, it is clear that the counselor was providing recommendations specific as to E.S.'s needs and as to how she could make academic progress, given that she made an effort in the email to point out the programs that provided on-site academics and schooling.

36.  The counselor did not inform Parents that a change of placement could be made available through the IEP.

37.  E.S. transitioned from the hospitalization to a partial hospitalization program (PHP) on or around November 20, 2020.  Initial PHP assessment documentation indicated that she presented with suicidal ideation, depression, anxiety, and tics. Suicidal ideation had been present since age 11.  The PHP team recommended intensive programming that would include DBT, individual therapy, family therapy, art therapy, and group therapy.  E.S. was placed at Visions Day School within the Intensive Outpatient Treatment program for her PHP.

38.  The ALJ found that it was evident to District at this time that E.S. required further assessment.  District did not immediately initiate an evaluation upon becoming aware of the hospitalization.

39.  In December 2020, District proposed to convene an IEP meeting.  No written documentation was provided to Parents related to the purpose of this meeting, and Parents continued to be completely unaware that mental health supports, or specialized placements could be provided through the IEP.  The evidence at hearing established that Parent relied upon the advice of the school counselor, who remained a trusted person for her in the District staff.  After speaking with the counselor, Parent did not attend the IEP because she did not believe that anything different could or would be offered, and she was at that time overwhelmed by the current situation of working with E.S.'s treatment team at Visions.

40.  District did not make multiple efforts or documented efforts to obtain Parents' participation in the proposed amendment.  District did not offer any alternative dates or alternative means of providing input.

41.  District then convened the amendment IEP meeting on December 15, 2020. No actual changes were made to E.S.'s program at that time.  Instead, it appears that this "IEP meeting" was a meeting among three District staff in order to discuss their own concerns about the current situation.  The notes reflect that these individuals discussed the fact that E.S. had been "unilaterally placed" in a

specialized program, that a release of information had already been provided, and that the District did not have a lot of information about the program.  It was unclear from District witnesses' testimony as to why they did not gather that information prior to this IEP.  The notes and the testimony of District staff also indicated that discussion was held regarding the fact that Parents had opted for "BHUSD Live," the District's independent study program.  District staff did not believe this would provide E.S. with enough SAI and support.  The IEP documented that services could not be provided if E.S. was enrolled through BHUSD Live.  As concluded by the ALJ in the underlying matter, the District's actions surrounding this IEP and its decisions related to the E.S.'s supports and services while in BHUSD Live constituted clear predetermination.  Additionally, the District allowed E.S. to enroll in BHUSD Live as any other student in the District would be, but then refused to provide the disability-specific interventions and services that she needed to benefit from her instructional program and to have equal access to this District program.

42.  The notes of the IEP also documented that a further IEP would be held to discuss the need for a counseling goal and counseling services.  The school psychologist was not invited to attend this December 2020 meeting.  At some point subsequent to the meeting, however, a goal into this IEP after it was already completed.

43.  Evidence in the underlying due process hearing established that the IEP

documentation itself was quite confusing, and that the District could not establish what documents were actually provided to Parents at the time, and the content of those documents. The "services grid" was changed at some time, but District witnesses gave contradictory testimony as to why and when this occurred.

44. Again, the District did not offer either the counseling service or a goal to address her social/emotional needs. However, in a later letter requesting records the IEP was unilaterally changed by the District that now included counseling services and a related goal. However, in review of records received after March 2020 that this was the actual time the IEP document was modified.

45. At Visions Day School, E.S. received intensive therapeutic support throughout her day. She also received support from the Visions team to complete her academics. Around that time, Parents had opted to enroll E.S. in District's independent study program rather than distance learning through her regular school. Visions staff provided direct, 1:1 support for up to 3 hours per day in order for E.S. to be able to complete the work necessary for this independent study program.

46. In January 2021, the Visions team made the determination that E.S.'s needs were more severe than could be met through the PHP model, and that she required residential-level treatment where services and interventions could be provided on a wrap-around basis and her safety could be ensured. E.S. transitioned to Visions

Residential Treatment.  The treatment plan indicated continuation of depression, with a depressed mood present throughout most of the day.  She presented with recurrent suicidal ideations and worries/fears.

47.  Within the residential program, E.S. continued to receive significant support to access academics.  She was in a classroom with multiple adults available to provide teaching, 1:1 support, and assistance with completing her assignments.  She required this intensive support throughout her time in the Visions classroom in order to complete any of her work from her District program.

48.  On March 5, 2021, District convened E.S.'s annual IEP.  District had waited until E.S.'s annual was due to convene another meeting, despite knowing at the December 2020 IEP, the change in circumstances for E.S. The District staff finally acknowledged the changed circumstances and the need for additional services.

49.  The "present levels of performance" ("PLOP") in this IEP noted that E.S. was completing her online classes "while at Visions with staff support," and that she was stressed and anxious about school specifically.

50.  The actual offer in this IEP was substantially the same as prior offers despite significantly changed circumstances.  District offered SAI through a co-taught math class, and additional SAI through a "general studies" class.  The notes stated that this was a continuation of exactly the same program District had already offered.  District did add counseling services, but at a minimal level of 400 minutes

for the entire year broken into 10 sessions (i.e., 40 minutes per month).

51.  District staff's questions regarding Visions at this IEP were primarily focused on the discharge date.  Parents did note that E.S. was getting the support she needed, but that it was anticipated that she would need to discharge to a different residential level treatment program.  Parents had already signed releases for District to speak with Visions staff at that time.  Visions had reported significant struggles with self-regulation.

52.  District offered – for the first time – to conduct an Educationally Related Intensive Counseling Services ("ERICS") assessment at the time of this IEP.  Both at this IEP and in other communications, District staff repeatedly indicated that this assessment had to be conducted before alternative placements such as residential treatment could be considered.

53.  On March 19, 2021, Dr. David Morrison, a non-district assessor, completed a comprehensive Psychological Evaluation of E.S. while she was at Visions.  The assessor found that E.S. presented with significant interpersonal relationship difficulties, emotional and behavioral dysregulation, excessive anxiety symptoms, and overall severe emotional distress.  Staff at Visions reported that even while in residential treatment, they continued to have concerns about immaturity, emotional and behavioral dysregulation that included significant outbursts, severe anxiety symptoms, obsessive-compulsive features, difficulties with peers, difficulties with

problem-solving skills, processing issues, poor frustration tolerance, reactivity with confused, and poor self-esteem.  The assessor found that overall, E.S.'s profile was unusual and severe, even within the context of clinical samples/comparison with peers in clinical treatment.  He diagnosed E.S. with ADHD, Generalized Anxiety Disorder, and Major Depressive Disorder, while noting that her diagnostic profile was particularly complex and was "not easily treated."

54.  The assessor recommended continued residential treatment, for the immediate to continue at Visions and then to include long-term residential treatment center (RTC) placement.  He noted that an RTC should be sought through E.S.'s IEP.  He further noted that E.S. did not respond to psychiatric hospitalization, intensive outpatient treatment, or short-term residential treatment, and required a full-time therapeutic setting in order to access educational progress.  Additionally, the assessor recommended intensive counseling/therapeutic services, family therapy, and psychiatric care/medication management.

55.  On March 19, 2021, Parents signed District's proposed assessment plan for an ERICS evaluation and provided a copy of the Psychological Evaluation by Dr. Morrison and assessment documents from Visions.

56.  On April 1, 2021, Parents' Advocate sent written correspondence to District regarding ongoing concerns and E.S.'s need for RTC placement in order to receive a FAPE.  It was documented that Parents did not agree with the IEPs from

December 2020 or March 2021.  The letter provided details to District regarding the supports that E.S. was receiving at Visions to complete her academic assignments from the District, and that only with these in-person intensive supports and placement in a residential program was she able to make any academic progress.  The letter provided notice that Parents had been forced for seek out the necessary services on their own in the absence of appropriate interventions through E.S.'s IEP.  Parents requested an emergency IEP meeting to discuss RTC placement.

57.  The primary purpose of this letter, as stated in the letter itself and testified to by Parents, was to seek an IEP meeting at which RTC could be discussed by the full team so that an appropriate program could be made available under the IEP.  The letter secondarily noted that should the District not act in a timely manner to make FAPE available, then in that circumstance Parents would have to place E.S. in a long-term RTC and seek reimbursement.  Parents were hopeful at that time, however, that an IEP could be held quickly and that RTC could be agreed upon by the team.

58.  The District team would not hold an IEP meeting immediately, instead opting to assert the "30 day" timeline for responding to an IEP request as justification for delaying a meeting.  As a result, District convened the IEP as late as possible within its 30-day timeline, and during those 30 days E.S.'s circumstances changed

once again due to the fact that she could no longer remain at Visions.  Parents were informed on April 8, 2021, that E.S.'s date of discharge from Visions would be April 19th.

59.  Given that Visions needed to discharge E.S. to her next program without further delay and given that there was still no IEP to consider RTC, Parents located an appropriate RTC themselves with the help of an educational consultant.  They located New Leaf Academy, which is a CDE-approved school located in Oregon.

60.  On the very same date upon which Parents had become aware of the discharge date from Visions, their Advocate immediately informed District of this and informed District that the need for an IEP was extremely urgent.  This correspondence made District aware that if E.S. was discharged without an IEP in place to provide her an appropriate program, Parents would place her at New Leaf.

61.  District's response to this urgent information was to state that it could take "30 days" to hold the IEP if it chose to.

62.  On April 14, 2021, Parents' Attorney filed for due process in the underlying case in this matter (2021040512).

63.  Subsequent to Parents' filing of the due process complaint, District offered dates for the requested IEP meeting.  The dates offered were at the very end of its 30-day timeline.

64.  On or around April 16, 2021, the District's ERICS assessor began to gather

information for the assessment, almost a month after the assessment plan was signed.

65.  On April 21, 2021, District sent Parents a letter purporting to be "prior written notice" in response to the request for a change of placement.  District indicated in this letter that it would consider RTC when the ERICS assessment was complete.  Further, despite the fact that the IEP offer had been SAI through a co-taught class and a general studies class, the letter referenced a special day class program as part of what was offered for FAPE.  Significantly, the placement referenced in this letter would ultimately be the only classroom the District would offer in two subsequent IEP meetings.  This was also the same SDC setting that had previously been proposed by the District team but never formally offered to E.S. in her IEP.  It was clear from this letter that the District had already decided what it would offer E.S. no matter the additional information that was or would become available, and its ultimate predetermination of the offered placement was evidenced by its actions beginning with this written communication.

66.  New Leaf accepted E.S. for admission.  On April 21, 2021, Parents' Advocate provided written correspondence to District alerting them that April 23rd would be the exact date upon which E.S. would be placed at New Leaf.  E.S. transferred to New Leaf on or around April 23, 2021

67.  New Leaf is a therapeutic boarding school for girls aged 10 to 15.  The

program at New Leaf is focused on the social, emotional, developmental, and academic needs of pre-adolescent and young adolescent girls.  New Leaf provides a developmentally appropriate therapeutic approach tailored to individual student needs, with a full range of interventions provided including individual, group and family therapy.  Interventions include CBT, DBT, EMDR, art therapy, and other modalities as appropriate for the individual student.

68.  Around this time, Parents and their Advocate also provided District with private assessment reports, signed releases, and additional information regarding E.S.'s programs.  Parents had always signed every release requested and provided private reports immediately.  District staff repeatedly insisted, however, that the releases did not cover the information they sought, and each time Parents signed the additional releases as well.

69.  On April 27, 2020, Parents and District participated in a Mandatory Resolution Session regarding the due process complaint filed by Parents' attorney.  There was no document requesting or agreeing for confidentiality for this meeting. In the meeting, Parents and their Advocate attempted to explain why the need for RTC had been urgent and immediate, but District's representative and its legal counsel insisted that it would gather information through the ERICS process and then consider RTC.  An IEP meeting was scheduled for two days after this meeting, and Parents were made to believe from these statements that it had already been

determined that RTC would not be offered at that time.

70.  On April 29, 2021, District convened an Addendum IEP.  The ERICS assessor and the school psychologist were invited to this meeting yet had little to no updated information to share with the team.  The District offered SAI within the District's "Counseling Enriched Class" for 5 periods per school day, with individual counseling 60 minutes per week and parent counseling 120 minutes per month.  There was no specific plan for additional services to support a transition out of RTC back to the District's school.  In the hearing in this matter, District's own witness testified that typically the transition out of an RTC back to a local school takes approximately 3 months of planning.

71.  The teacher from the District's offered CEC class present at this meeting explained that students in his classroom typically required counseling at a level of one time per week, and that they had some behavioral dysregulation that had made them unsuccessful in less restrictive classrooms.  Parents expressed concerns that this did not seem like the right fit for a student like E.S., who required much more intensive counseling support and residential treatment.

72.  E.S.'s therapist from Visions was also present at this IEP meeting, and shared examples of the significant mental health concerns that had arisen while E.S. was at Visions.  She explained the level of intensive therapeutic care E.S. had received there, including the support provided in the classroom and the round-the-clock

therapeutic interventions.  She expressed that E.S. could not safely be discharged from residential care.  She adamantly disagreed that E.S. could be appropriately placed in the offered program from the District.  Her verbal input was not incorporated accurately into the IEP notes, but she testified credibly regarding her recollection of what she shared at that meeting.

73.  When Parents expressed concern about the CEC proposal, District staff once again refused to discuss RTC until the ERICS assessment was completed.

74.  Parents gave verbal notice of the intention to seek reimbursement for New Leaf at this IEP meeting.

75.  Parents continued E.S. at New Leaf after the IEP at their own great financial hardship.

76.  District did not immediately provide a copy of the IEP documentation from the April 2021 meeting.  In fact, it was not provided to Parents until May 27, 2021, the same date on which the next IEP – to review the ERICS assessment – was held.

77.  On May 27, 2021, District convened another IEP meeting, and at this meeting its ERICS assessor reviewed her report and recommendations. Although the ERICS assessor gather information from a variety of sources and documented what appeared to be a lengthy description of that gathered information, she failed to accurately reflect the input provided by various professions who worked with E.S. during the time since her hospitalization.  Multiple witnesses testified that the

information in the report was lacking in important details they had shared about E.S.'s areas of need and their concerns or recommendations.  This lack of professional input skewed overall the findings to give the impression that E.S.'s needs were less severe than Parents and their experts saw.  Additionally, within the "indicators" that were reviewed, the assessor misstated historical information regarding E.S.'s interventions and services.

78.  Despite the fact that the ERICS report contained clear documentation of an explicit recommendation for placement in the District's CEC program, the ERICS assessor herself testified that she did not make placement recommendations in her reports.  She also testified that she did not make recommendations in her reports as to whether RTC was needed, but instead only reviewed the "indicators" and then the team would discuss RTC on that basis.  However, her report contained a clear opinion that RTC was not needed.

79.  The evidence presented in the hearing established that the District had predetermined to offer CEC and not to consider RTC prior to the meeting.  The ERICS report merely documented the exact same placement that had already been offered as a "recommendation," even though the assessor herself stated in testimony that it was not her role to recommend any placements.  This is consistent with District's earlier behavior of utilizing the IEP process merely to "formalize" what had already been decided or offered.

80. At the IEP meeting, the District continued to offer the CEC class with the same related services for counseling and parent counseling. The ERICS assessor recommended additional "Intensive Support Services" which were to be provided outside of the school day with a focus on "helping Parents get student to school." This service would be provided as 60 minutes per week of parent counseling, 180 minutes per week of behavior intervention, and 120 minutes per month of consultation and data collection. It was unclear whether these were offered on an ongoing basis or simply during the transition period from the RTC.

81. Parents were not provided with a copy of the May 2021 IEP document until June 8, 2021.

82. Parents, through their attorney, filed an amended complaint in the due process matter on June 8, 2021.

83. E.S. remained placed at New Leaf during the pendency of the underlying matter due to Parents' disagreement with the offer of FAPE.

84. Evidence presented in the hearing established that E.S. benefited from the intensive support and services provided by the staff at New Leaf. E.S.'s academic skills needed significant intervention, and she required intensive individualized supports in the classroom to be regulated and complete work. Testimony by New Leaf staff established that appropriate academic instruction was being provided along with the intensive mental health services that were needed for her to benefit

from that instruction.  The entire program is highly specialized and therapeutic, including the embedded supports provided in the school setting as well as the direct interventions provided in the residential setting.

## FACTS RELATED TO ADMINISTRATIVE HEARING

85.  Parents' initial Due Process Complaint was filed with the Office of Administrative Hearings ("OAH") on April 14, 2021, and the matter was designated as case no 2021040512.  Parents filed an Amended Complaint on June 8, 2021.  Parents asserted in their Complaints that District had failed in its "child find" duties under the IDEA for the time period prior to E.S.'s initial IEP in February 2020.  They further asserted that District had committed numerous procedural violations in the development of all of E.S.'s IEPs and had failed to adequately assess E.S.'s needs, resulting in a denial of FAPE.  Finally, Parents asserted that District had not made a substantively appropriate program available to E.S. at any time because it had failed to provide adequate placement, services, and supports to address her needs and allow her to make appropriate progress.

86.  The underlying due process hearing in this matter was held on August 17 – 19, 24, 26, 31 and September 1-2, and 9, 2021.  The hearing was presided over by ALJ Judith Pasework.

87.  Closing briefs were filed on October 5, 2021.

88.  Reply briefs were filed, the matter was closed, and the matter was submitted

on October 12, 2021.

89.  On November 12, 2021, ALJ Pasewark issued a Decision in this matter.  On November 22, 2021, ALJ Pasewark issued a Corrected Decision.

90.  The ALJ found that as of October 2, 2019, BHUSD had sufficient information to constitute a reasonable suspicion Student was a child with a disability. The information supplied from Student's private therapist reported a plethora of social-emotional and behavior issues, some of which "permeated" into the classroom setting. BHUSD failure in its child find duties as of October 2, 2019, constituted a procedural violation of the IDEA.

91.  As to the 2020-2021 school year, the ALJ found that Student was denied a FAPE when the District did not act upon sufficient evidence of E.S.'s escalating needs beginning in November 2020.  The ALJ further found that the District predetermined changes to Student's program, did not provide prior written notice related to the December 2020 IEP, failed to have all required team members at the December 2020 IEP, including Parents, and delayed the process of initiating an ERICS assessment, all of which were found to infringe upon parent participation in the process.

92.  The validity of the IEP is based upon what BHUSD knew, not on what else they wanted to know. BHUSD had sufficient information from the November 12, 2020, IEP team meeting to establish Student's increasing anxiety and academic

difficulties, and appropriately made modifications to Student's IEP at that time to increase academic support in math. BHUSD maintained Student's anxiety and behavioral issues were based on the family dynamic in the home setting. At minimum, the IEP team failed to address the fact that this anxiety permeated into the school setting and was increasing during the 2020-2021 school year. The IEP team failed to even consider conducting an ERICS assessment to obtain vital information.

93. The ALJ found that in addition to the blatant procedural violations which occurred December 15, 2020, and January 2021, the December 2020, IEP, February-March 5, 2021, IEP, and April 29, 2021, IEP substantively denied Student a FAPE.

94. The ALJ concluded, however, that the District did not predetermine the placement offered in the April 2021 and May 2021 IEPs, and that the May 2021 IEP substantively offered E.S. a FAPE. The ALJ further concluded that the District's evaluations in February 2020 and the ERICS assessment of May 2021 were appropriate, though she faulted the District for a failure to assess as required under the IDEA when it did not conduct the ERICS assessment sooner.

95. Significantly, the ALJ's findings were that it was the obligation of District to seek the assessment when the suspicion of need arose on November 18, 2020, this constituted an unreasonable delay in assessing Student in all areas of suspected disability meeting to determine Student's annual IEP. The ALJ found that this

delay unreasonably denied the IEP team of crucial information needed to review and revise Student's eligibility, services, and placement; the same information the IEP team sought on March 5, April 27, and May 27, 2021. This delay significantly impeded parental participation in the decision-making process regarding the provision of a FAPE and caused a deprivation of educational benefits resulting in a denial of FAPE.

96.  The ALJ also emphasized the role of parent participation in placement determinations within her findings related to the December 15, 2020, IEP meeting. The ALJ concluded that District's failure to provide Parent with prior written notice for actions related to that meeting and failure to include Parents as an IEP team member infringed on parental participation in the process, and she emphasized that at that time, Parent input about E.S.'s needs would have been critical.

97.  As to the IEPs in April and May 2021, the ALJ erred in her conclusion that District did not predetermine the placement offer for those meetings.  Parents' and their expert's testimony that District staff presented an offer of placement that had already been decided was corroborated by multiple other pieces of evidence.  First, the prior written notice letter that Parents received prior to the April meeting documented the CEC class as a component of what the District believed to be a FAPE for E.S., despite the fact that this class had never been part of the IEP offer

for E.S.  Second, in the Mandatory Resolution Session held two days prior to the April 2021 IEP, the District representative made it clear that an RTC would not be considered in that IEP meeting when she indicated that the District would review the need for RTC after completing the pending ERICS evaluation.   Third, the ERICS evaluation itself contained an explicit written "recommendation" of the CEC setting, using the same description and language regarding that placement as the District had already used in the April IEP and its prior written notice letter. The ALJ erred in her findings regarding this assessment in that she stated that the assessor did not make recommendations for Student's placement because it was a decision for the IEP team to make, thereby ignoring clear written evidence that supported predetermination outside of the IEP process.  The ALJ indicated as to the April 2021 IEP that it was concerning that the ERICS assessor had attended when she had nothing to report, given the dispute regarding placement, noting that Parents were concerned that the ERICS assessment was then biased.  Fourth, the ALJ ignored testimony from District's expert, who plainly stated that she was "brought in" to the IEP process in the District for students for whom RTC would be discussed as a possible offer, yet she had not been brought into any discussions related to E.S. until much later, in the fall of 2021 when it was anticipated that she would testify in the hearing in this matter.

98.  The ALJ also erred in finding that the May 2021 IEP was substantively

appropriate.  The ALJ contradicted her earlier findings related to E.S.'s escalating anxiety, which she found to be permeating into the school setting even if they were primarily stemming from anxiety displayed at home.  In regard to the May 2021 time period however, the ALJ ignored evidence that this would still be the case and that E.S. could not safely be exited from a residential setting.  In her findings regarding the ERICS report, the ALJ noted that the assessor had "discounted" E.S.'s escalating anxiety and dropping academics that had previously occurred in the 2019-2020 school year.  She noted that the assessor had reasoned that E.S. had not self-harmed in the residential settings as a justification for then not recommending an RTC setting.  In so doing, she ignored credible and well-supported evidence from those who actually worked with E.S. in those settings, which had demonstrated that E.S.'s risks of self-harm were mitigated specifically by the supports available in an RTC program.

99.  The ALJ further erred in finding that the May 27, 2021, IEP would not only offer E.S. a FAPE but would be "timed to provide Student a seamless transition to the CEC."  The ALJ then inequitably cut off Parents' reimbursement remedies as of June 2021, when they finally received the May 2021 IEP document.  This finding and remedy award is not supported by the evidence.  The evidence established that even if the May 2021 placement offer were a FAPE, which it was not as stated above, Parents could not have immediately exited E.S. from the RTC

on the date they received the IEP simply because the District had now made a new offer available. The extra supports and services offered by District in the IEP purportedly to support transition were to be implemented once the IEP was being implemented and E.S. had returned home. The evidence, however, from District's own expert was that the process for planning for a student to exit an RTC and transition home would take approximately 3 months prior to the exit date, during which the District team and the RTC team would be working on planning and preparing student for the transition. Abruptly ending E.S.'s placement – where she was finally making real progress in her mental health so that she could access her education – would not be conducive with a successful transition.

100. The ALJ also failed to consider evidence that even if the behaviors did occur with E.S.'s relationship with her Parents and in the home, the May 2021 IEP offer was to bring E.S. home against professional recommendations of her treatment team. The ALJ had already found that District denied a FAPE by failing to assess E.S. in November and December 2020 when BHUSD had information of E.S.'s mental health, regardless of whether Student's need was triggered in the home setting. The ALJ then failed to apply that same sound reasoning to the conclusions as to the May 2021 IEP decisions.

## **SUBSEQUENT FACTS**

101. E.S. remained placed at New Leaf after the OAH Decision in this matter

due to the fact that Parents were advised by their experts that she could not safely be discharged home.

102.    New Leaf treatment notes from the fall of 2021 indicate that E.S. was making progress, but that she still experienced difficulties with emotional regulation.  Specifically, it was noted that she had difficulty sharing in group therapy and to responding to the support provided in a group setting, required frequent redirection and encouragement to participate, struggled significantly at times with completing group therapy activities, and required constant support.  In group, she was able to identify an emotion ("terrified") and shared anxiety and "a lot of fear" related to going home for a visit.  She presented as anxious even within the therapeutic setting.  In family sessions, E.S. often participated cooperatively and to the best of her ability, but she still presented with an excessive anxious mood, tense affect, and "constant dysregulation."  At times she was frustrated and anxious and had tears, break-down in communication, and a sad affect.  In at least one session, she was noted to become so dysregulated that she "spiraled."  In individual sessions, it was noted that progress was sometimes difficult due to her distorted view of self-worth, rigid thinking, excessive irritability, and restlessness. She could be "challenging" in sessions, and presented with crying, upset mood, restless body language, and signs of distress.  At times, her excessively anxious presentation made it difficult for her to have insight during therapy.

103.    Therapy notes from this time also indicate that E.S. shared her own concerns about school and about returning home from New Leaf.  E.S. expressed that school had "never been a safe place" for her.  She expressed her feelings related to an incident in which she was locked in a closet at the District school and expressed that "nothing was done" about it by the school.

104.    E.S. reportedly engaged in self-harm at least once in the RTC, though it was "superficial."  Her self-harm urges were reduced, and she denied suicidal ideation.  However, this was in the context of being provided with significant 24/7 supervision and intensive daily interventions.

105.    The New Leaf team reported that E.S. experienced high levels of anxiety in the academic setting and did not respond to "co-regulation" in that setting.  She reportedly did not have internal regulation skills necessary in a classroom setting but responded well to adult facilitation and guidance.  Academically, with a significant level of intervention and individualized support, E.S. was earning A's and B's.

106.    E.S. was also provided with ongoing psychiatric management while at New Leaf.  The doctor providing this support documented that E.S.'s self-harm and suicidal risks were "mitigated with continued psychotherapy… medication management, and continued engagement in the New Leaf Academy program."  It was noted specifically that she was at low risk for self-harm and other harm "in

this setting," and that she was "appropriate for continued residential care."

107.    E.S.'s program at New Leaf includes academic instruction in a highly specialized setting with low teacher to student ratio and embedded and individualized support for her mental health needs.  Specific therapeutic interventions also include family therapy at least one time per week, group therapy 2 to 3 times per week, individual therapy at least 1 time per week, participation in recreational therapy, and support within the residential setting.

108.    On February 8, 2022, Parents attended a classroom observation of the CEC program as offered by District.  Parents did not observe that this classroom would be a good fit for E.S.  Parents were also informed by the District staff during this visit that all of the CEC students take their PE class and an elective class within the main campus.  This information directly contradicted testimony given at the hearing by District witnesses that claimed that in the current model of the CEC program at the high school level, the students spent the entire day in that setting and did not cross the street to go to the larger comprehensive high school.  Partial day participation in the large comprehensive high school campus has been a concern of Parents in regards to the CEC program at all times.

//

## FIRST CLAIM FOR RELIEF

**Defendant violated the procedural requirements of the IDEIA and ultimately illegally predetermined Student's placement and services in the April 2021 IEP and May 2021 IEP in violation of 20 U.S.C. §1415(b)(1), 34 C.F.R. §300.502(c), 20 U.S.C. §1414(e), 34 C.F.R. §300.116(a)(1), Cal. Educ. Code §56341.1(a). The ALJ erred in determining that Defendant did not procedurally deny student a FAPE by failing to consider Parent concerns and by predetermining Student's program.**

109. Paragraphs 1 through 108 are re-alleged herein as if fully restated.

110. The conduct of Defendant as alleged herein has violated and continues to violate Parents' rights to meaningful participation in the IEP process and Student's right to a FAPE as guaranteed under the IDEIA. Defendant failed to meet its legal obligation under the IDEA to include Parents as meaningful participants in the process and refrain from predetermining the offer of placement and services in the April 2021 and May 2021 IEPs.

111. Parents are intended to be equal participants in the IEP development process, and school districts are prohibited from predetermining the offer of placement and services outside of the IEP process. *See* Cal. Educ. Code §56341(b)(1); 20 USC §1414(e); 20 U.S.C. §1414(d)(3)(A)(i); 34 C.F.R. §300.116(a)(1); and *Deal v. Hamilton County Bd. Of Educ.*, 392 F.3d 840 (6th Cir. 2004).

112. The ALJ erred in her finding that Defendant ensured that Parents were equal participants in the process, had an open mind to alternatives other than what it intended to propose, and did not predetermine Student's program in the April 2021 and May 2021 IEPs. The evidence established that Defendant determined prior to

the April 2021 meeting that it would offer the CEC program to E.S., and that it would not offer a RTC setting.  The District formalized this predetermined decision in the April 2021 IEP, and thereafter both its ERICS assessment and the subsequent May 2021 IEP were merely rubber stamping this already predetermined decision.

113.  The ALJ erred by failing to consider ample evidence that indicated that Defendant failed to come to the IEP meetings with an "open mind" to a variety of program options and that it failed to allow Parents to be equal participants in the decisions made regarding Student's program.  District staff had already determined to offer the CEC program prior to any meeting with Parents to discuss placement in April and May 2021.

114.  The ALJ erred by failing to consider significant evidence, including within the District's own documents and by its own witnesses, that demonstrated that the District had unilaterally determined it would not offer an RTC.

115.  The ALJ erred as a matter of law by ignoring the clear mandate of the IDEA to include Parents as equal participants in decision-making during the IEP process.  The longstanding precedent of the 9th Circuit holds that "an IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed."  *See Amanda J. v. Clark County School District*, 267 F.3d 877 (9th Cir. 2001); *W.G. v. Board of*

*Trustees of Target Range School District No. 23*, 960 F.2d 1479 (9th Cir. 1992).

116.  Based on the foregoing the ALJ erred in her determination that Defendant did not commit procedural violations regarding the development of the April and May 2021 IEPs.  Defendant's decision as to placement in May 2021, which is at dispute in the claims related to substantive FAPE contained herein, is inextricably linked to its predetermination at the time of the April 2021 IEP.

117.  As stated herein, the ALJ erred in finding that Defendant did not procedurally deny FAPE in the April and May 2021 IEPs by ignoring credible evidence supporting a finding that Defendant did not have an open mind to any other placement options and had decided prior to the April meeting that it would offer the CEC classroom. Defendant violated the IDEA and California law, resulting in an infringement on Parents' right to meaningful participation in the IEP process and in a denial of educational benefits and opportunities for Student, thereby denying Student a FAPE.  The refusal to include Parents as equal participants in decisions made regarding the provision of FAPE necessarily results in an IEP that was inappropriate and failing to consider Parent concerns and input therefore invalidates both the April 2021 IEP and the May 2021 IEP.

## SECOND CLAIM FOR RELIEF

**Defendant failed to make FAPE available to E.S., including placement in an appropriate RTC program that would meet her needs and provide her with educational benefit as required under 20 U.S.C. §1400 et seq. and *Endrew F. v.***

***Douglas County*, and the ALJ erred in determining that Defendant offered E.S. a FAPE in the May 2021 IEP. The ALJ erred in determining that E.S. did not require an RTC setting as of May 2021 and that the IEP offered a FAPE.**

118. Paragraphs 1 through 117 are re-alleged herein as if fully restated.

119. As stated herein, the ALJ erred in finding that the May 2021 IEP offered E.S. a FAPE in that she ignored credible evidence that demonstrated that E.S. could not benefit from a less restrictive setting at that time.  The conduct of Defendant as alleged herein has violated and continues to violate Plaintiff E.S.'s right to a FAPE as guaranteed under the IDEA.  Defendant failed to meet its legal obligation under the IDEA and California law to offer and provide Student with a program that met her unique needs and provided her with an educational benefit.

120. The IDEA defines a FAPE as "special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the state educational agency; (C) include appropriate preschool, elementary school or secondary school education in the state involved; and (D) are provided in conformity with the individualized education program required under §1414(d)." 20 U.S.C. §1401(9).  The Supreme Court has defined a substantive FAPE as a program which is (1) reasonably calculated to enable the child to receive educational benefit; (2) tailored to the unique needs of the child; (3) in conformity with an IEP; and (4) in the least restrictive environment.  *See Board of Education v. Rowley*, 458 U.S. 176 (1982).

121.  In *Endrew F.*, the Supreme Court further clarified the meaning of "educational benefit" within the definition of FAPE, holding that school districts must offer an IEP that is "appropriately ambitious" and allows the child to have the chance to meet "challenging objectives" for the child to receive a meaningful educational benefit.  *Endrew F. v. Douglas County School District RE-1*, 137 S. Ct. 988 (2017).

122.  Here, Defendant failed to offer and provide E.S. with a FAPE in the May 2021 IEP by failing to develop a substantively appropriate program designed to meet her unique needs and to provide her with educational benefit.

123.  By the time of the May 2021 IEP meeting, E.S. was benefiting from her program at New Leaf, a unilateral placement that had been necessitated by the District's failure to offer E.S a FAPE as noted by the ALJ.  The ALJ erred by ignoring considerable testimonial and documentary evidence that demonstrated that E.S. could not have benefited from transitioning out of her specialized RTC program at that time.

124.  The ALJ erred by ignoring expert testimony establishing the severity of E.S.'s social emotional needs and behaviors, and the evidence demonstrating she required a more restrictive environment than offered by Defendant.  The "least restrictive environment" does not require that students always be placed on a regular school campus, but rather requires that students be placed in the setting

where that student can access her education and make progress.  E.S could not have made progress in a setting less restrictive than an RTC at that time.

125.   The ALJ further erred in finding that the May 2021 IEP adequately addressed services and a plan for E.S.'s transition should the placement offered be implemented.  Credible evidence established that the additional services offered in the IEP would not have been enough to meet E.S.'s needs.

126.   The District was required to provide E.C. a program that would enable her to make *meaningful* progress.  *See e.g., Endrew F. v. Douglas County School District RE-1*, 137 S. Ct. 988 (2017); *Draper v. Atlanta Indep. Sch. System*, 518 F.3d 1275 (11th Cir. 2008); *Unionville-Chadds Ford Sch. Dist.*, 47 IDELR 280 (PA SEA 2007); *Dept. of Educ., State of Hawaii*, 47 IDELR 238 (HI SEA 2007); *Blake C. v. Dept. of Educ, State of Hawaii*, 593 F.Supp.2d 1199 (D. Haw. 2009).  During the year prior to the hearing in this matter, the evidence established that E.S. was only able to make progress and access her education during the time that she was in an intensive treatment program and provided with appropriate therapeutic supports in a residential program.  E.S. had been placed in a non-residential program within the PHP, but *all* of the experts working with her had come to the conclusion that a more restrictive setting was necessary in order for her to make meaningful progress.

127.  Based on the foregoing the ALJ erred in her determination that Defendant

offered and provided E.S. with a FAPE by providing a program that met her unique needs and provided her with educational benefit in its offer of placement and services in the May 2021 IEP, thereby denying E.S. a substantive FAPE as guaranteed by the IDEA.

## **THIRD CLAIM FOR RELIEF**

**Parents are entitled to reimbursement for the unilateral placement of E.S. beyond the time period ordered in the Decision, under the provisions of the IDEA and *School Committee of the Town of Burlington v. Department of Education*, 471 U.S. 359 (1985) and subsequent case law. The ALJ erred in determining that Parents' reimbursement was limited to the time through June 2021 when they received the May 2021 IEP.**

128.  Paragraphs 1 through 127 are re-alleged herein as if fully restated.

129.  Reimbursement remedies are part of the court's resources in crafting "appropriate relief" under the IDEIA, and therefore equitable considerations are relevant to a parents' request for reimbursements.  *See School Comm. of the Town of Burlington v. Dept. of Educ.*, 471 U.S. 359, 374 (1985).  The court is authorized to craft an appropriate remedy that meets the purposes of the IDEA.  See *Id.*.

130.  Where the district failed to provide student with a FAPE, and thereby denied that student the benefit of an appropriately developed individualized plan to meet her needs, appropriate relief must be fashioned to enable the child to receive a FAPE and bring the child to where he would have been if the District had provided appropriate services.  *See Torrance U.S.D.,* OAH Case No. N2006100346 (SEA

Ca. 2006) (*quoting Reid ex rel Reid v. District of Columbia*, 401 F.3d 516 (D.C. Cir 2005)); *see also Branham v. District of Columbia,* <u>44 IDELR 149</u> (D.C. Cir. 2005).

131.  Parents are entitled to reimbursement if the unilateral placement met the child's needs and provided the child with an educational benefit, and it is not necessary for the private placement or services to meet the strict IDEA definition of a FAPE, or that it is certified to provide special education.  *See Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993); *see also M.S. ex rel S.S. v. Board of Education*, 231 F.3d 96, 102 (2nd Cir. 2000), *cert denied* 532 U.S. 942.

132.  The ALJ erred as a matter of law when she failed to award reimbursement for the unilateral placement of E.S. in an RTC beyond June 2021.  The ALJ found that District's violations of the IDEA in the fall of 2020 up until the May 2021 IEP did not significantly infringe on Parents' participation in the process that substantively denied E.S. a FAPE.  Cutting off the remedy as of the date upon which Parents received a copy of the May 2021 IEP was an abuse of discretion.

133.  The ALJ ignored clear evidence that demonstrated that even if the May 2021 IEP were acceptable on its face, it could not have been immediately implemented the moment the document was received and still be appropriate for E.S.  Evidence from Defendant's own expert witness established that the typical timeframe for transitioning a student out of an RTC was around three months, during which joint

planning between the IEP team and the RTC staff would take place.  Expecting

E.S. to immediately be cut off from her appropriate placement would be

detrimental.

134.  The ALJ also ignored the fact that E.S.'s unilateral placement by Parents had

been necessitated by Defendant's own failure to previously offer her a FAPE.

Parents placed E.S. at New Leaf due to the District's delays in addressing her

needs within the IEP process, delays that the ALJ acknowledged denied her a

FAPE.  It is unreasonable to expect that she could then be abruptly removed from

the placement, and it is inequitable to expect Parents to bear the burden of the

continued costs beyond June 2021 when the District's own actions caused her to be

there in the first place.  Reimbursement should have been awarded through the

time when an appropriate transition could be implemented with the RTC team,

even if the ALJ were correct as to her finding regarding the May 2021 IEP.

135.  Equitable factors therefore weighed in favor of full reimbursement for the

placement beyond the time covered by the ALJ's order.

136.  Clear precedent establishes the importance of parent participation in

placement determinations as an important factor in reimbursement considerations.

*See N.B. v. Hellgate Elem. Sch. Dist.,* 541 F.3d 1202, 1207 (9th Cir. 2008).  Here,

it was established that the District infringed on Parents' right to meaningful

participation in multiple IEPs.

137.  Finally, Parents are entitled to reimbursement for the unilateral placement because Defendant's offer in the May 2021 IEP was not substantively appropriate in that it did not ensure that Student would make meaningful progress and did not address all of Student's unique needs, including the need for residential treatment, as alleged above.  Defendant's offer of placement for E.S. continued to be insufficient in May 2021, and Parents' unilateral placement was necessary to provide her with the supports and interventions missing from the District's program.

138.  It was clearly established through considerable evidence that the unilateral placement of E.S. at New Leaf was appropriate in that it met her unique needs, provided her with necessary interventions and supports, and provided her with educational benefit.

139.  In this matter, all equitable factors clearly weigh in favor of a full reimbursement award to Plaintiffs for the costs of unilaterally placing E.S. in an appropriate program, especially in light of the significant procedural noncompliance on the part of Defendant.  Parents, on the other hand, have been cooperative with the District, attended IEP meetings, and provided the District the opportunity to meet E.S.'s needs before determining that the private placement was necessary.

## FOURTH CLAIM FOR RELIEF

**Defendant failed to provide E.S. with a FAPE as required Section 504 of the Rehabilitation Act (29 U.S.C. § 794)**

140.  Paragraphs 1 through 139 are re-alleged herein as if fully restated.

141.  Section 504 of the Rehabilitation Act of 1973 provides in pertinent part:

"[N]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. . . ."  29 U.S.C. § 94; *see also* 34 C.F.R. §104.4.

142.  Plaintiff E.S. is a qualified individual with a disability within the meaning of the Rehabilitation Act because he has diagnosed disabilities that substantially limit one or more of her major life activities.  *See* 34 C.F.R. §104.3(j).

143.  Plaintiffs Justin Silvera and Stephanie Silvera are individuals with a known association with E.S. as her Parents, and therefore are also subject to the protections of the Rehabilitation Act.

144.  At all times relevant to this action, Defendant was a recipient of federal funding within the meaning of the Rehabilitation Act.  *See* 34 C.F.R. §104.3(f).

145.  Through its acts and omissions described herein, Defendant has violated the Rehabilitation Act by denying E.S. necessary disability-specific accommodations and services in the form of specialized placement and mental health services to address her needs arising from her known disabilities.  Defendant's actions

specifically violate the provisions of the implementing regulations of Section 504 at 34 C.F.R. §§104.4(b)(1)(i), (ii), (iv),(viii) & (b)(4).  Section 504 contains a FAPE mandate that requires the District to provide appropriate supports and services to ensure equal access to the educational benefits offered to students.  E.S could not enjoy equal access to the educational benefits offered within Defendant's instructional programs without significantly more interventions than what Defendant offered or provided.

146.  Defendants' refusal to offer appropriate supports to ensure equal access throughout the entire 2020-2021 school year was an intentional and willful disregard for E.S.'s right to individualized interventions to meet her disability-specific needs so that she could access the benefits of her educational program to the same extent as non-disabled peers.

147.  Defendant also implemented policies and procedures, including the determination related to E.S.'s support within the "BHUSD Live" program in the fall of 2020, that resulted in unilateral determinations regarding FAPE and a blatant disregard of her right to be free from discrimination under Section 504.

148.  Defendant was on notice that E.S. required specific and specialized interventions throughout the 2020-2021 school year but failed to provide E.S. with the required supports so that she could enjoy equal access.

149.  Based on the foregoing, Defendant's failure to provide the appropriate

supports and programs to ensure that she received the necessary disability-specific interventions was a violation of the provisions of Section 504 mandating provision of FAPE. *See Mark H. v. Hamamoto and Dept of Educ. for the State of Hawaii*, 620 F.3d 1090 (9th Cir. 2010).

150.  Plaintiffs are informed, believe, and based thereon allege that Defendant committed the acts and omissions alleged herein with intent and/or reckless disregard of the rights of Plaintiffs.  Defendant acted with deliberate indifference to Plaintiff E.S.'s known rights as a student with a disability.  *See Id.*

151.  As a direct and proximate result of the District's acts, Plaintiff E.S. was not provided with a FAPE as required under Section 504 and has suffered and continues to suffer lack of educational benefit and progress, humiliation, hardship, anxiety, indignity, and mental and emotional anguish.

152.  As a direct and proximate result of the acts, Plaintiffs Justin Silvera and Stephanie Silvera have suffered and incurred specific, direct, and separate damages apart from those experienced by Plaintiff E.S.  Plaintiffs' damages were directly and proximately caused by Defendant's discrimination alleged herein, including Defendant's deliberate indifference to E.S.'s rights under the IDEA and Section 504.  As a result of Defendant's failures, Plaintiffs have suffered and continue to suffer severe financial hardship and emotional distress, manifested in various forms, including but not limited to anxiety, depression, loss of sleep, and appetite.

153.  Pursuant to 29 U.S.C. §794a, Plaintiffs are entitled to recover from Defendant compensatory damages and their reasonable attorneys' fees and costs incurred in bringing this action under Section 504 in addition to remedies sought under the IDEA herein.  Furthermore, Plaintiff Parents are entitled to pursue remedies for violations of section 504 on their own behalf.  *Mark H. v. Lemahieu*, 513 F.3d 922 (9th Cir. 2009); *see also Mark H. v. Hamamoto*, 620 F.3d 1090 (9th Cir. 2010).

## FIFTH CLAIM FOR RELIEF

**Plaintiffs seek payment/reimbursement of their reasonable attorneys' fees and costs incurred in OAH Case Nos. 2014041256 & 2014050208 in this action. *See* 20 U.S.C. §1400 et seq.**

154.  Paragraphs 1 through 153 are re-alleged herein as if fully restated.

155.  Pursuant to the IDEIA, Plaintiffs are entitled to payment/reimbursement of their reasonable attorneys' fees and costs from Defendant District based on prevailing in the underlying matter, and if they are the prevailing party in this present action.

## PRAYER FOR RELIEF

156.  The Plaintiffs request that this Court enter an order requiring the administrative record, including Exhibits, Transcripts, Briefs, Pleadings and the ALJ's Decision, to be lodged and filed with the Court;

157.  The Plaintiffs request that this Court, upon *complete* review of the administrative record, find that the decision of the ALJ that Defendant did not

predetermine E.S.'s placement in the April 2021 and May 2021 IEPs be reversed;

158.  The Plaintiffs request that this Court, upon *complete* review of the administrative record, find that the decision of the ALJ that Defendant offered a FAPE to E.S. in the May 2021 IEP should be reversed.

159.  The Plaintiffs request that this Court, upon review of the administrative record, find that the decision of the ALJ that Parents were not entitled to reimbursement for the costs of E.S.'s unilateral placement beyond June 2021 be reversed, and that this Court award full reimbursement for all costs associated with the placement until E.S.'s discharge from residential treatment, on the basis of (1) the District's procedural violations, which impeded parents' right to meaningful participation; and/or (2) the District's denial of a substantive FAPE;

160.  The Plaintiffs request that this Court find that the actions and/or failures to act of Defendant were unlawful and discriminatory, thereby denying a FAPE in violation of Plaintiffs' rights under Section 504 of the Rehabilitation Act.

161.  The Plaintiffs request that this Court grant such relief as it deems just and appropriate under the IDEA, and Section 504, including:

      a.  An order that Plaintiffs be reimbursed for the full cost of all expenses related to E.S.'s unilateral placement at New Leaf to continue past June 2021 and through the current school year and

      b.  An order awarding Plaintiffs actual damages in regard to Defendant's

Section 504 violations, including all financial costs incurred by

Parents as a result of Defendant's actions.

162.  The Plaintiffs request that this Court order the Defendant to pay Plaintiffs'

reasonable attorneys' fees and costs incurred by Plaintiffs related to the underlying

due process hearings in this matter.

163.  The Plaintiffs request that this Court order the Defendant to pay Plaintiffs'

reasonable attorneys' fees and costs incurred in preparation and prosecution of this

matter; and

164.   Any such other and further relief as may be deemed by the Court to be

appropriate.

Dated:        February 10, 2022

By:        _____**s/**_____

N Jane DuBovy
A2Z Educational Advocates
Attorneys for Plaintiffs
E.S., a minor, and
Stephanie and Justin Silvera